MICHIGAN CONSOLIDATED GAS COMPANY v DEPARTMENT OF
TREASURY

DETROIT EDISON COMPANY v DEPARTMENT OF TREASURY

1. TAXATION—INCOME TAXES—STATUTES—GAS—EFFECTIVE DATE—
GROSS INCOME.

    The Michigan Income Tax Act of 1967 does not authorize a
    taxpayer to exclude from taxable income or deduct from gross
    income profits from the sale of natural gas and gas appliances
    acquired before the effective date of the act, but sold thereafter
    (MCLA 206.1 *et seq.;* MSA 7.557[101] *et seq.*).

2. TAXATION—INCOME TAXES—STATUTES—STATE TAXES—FEDERAL
TAXES—PIGGY-BACK APPLICATION.

    The Michigan income tax, both personal and corporate, was
    intended to be imposed piggy-back on Federal taxable income
    unless otherwise provided by statute.

3. TAXATION—INCOME TAXES—GAIN FROM INVENTORY—SPECIAL DE-
DUCTIONS—CAPITAL GAINS—GROSS INCOME.

    Gain from the sale of inventory, for Federal income tax purposes,
    is not subject to a special deduction; it does not produce capital
    gain entitling the taxpayer to a deduction from gross income.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 33 Am Jur 2d, Federal Taxation ¶ 2266.
  71 Am Jur 2d, State and Local Taxation § 565.
[2] 71 Am Jur 2d, State and Local Taxation §§ 451–600.
  Constitutionality, construction, and application of provisions of
    state tax law for conformity with Federal income tax or adminis-
    trative and judicial interpretation. 42 ALR2d 797.
[3] 71 Am Jur 2d, State and Local Taxation §§ 553–556.
[4] 71 Am Jur 2d, State and Local Taxation §§ 8, 9.
[5] 73 Am Jur 2d, Statutes § 343.
[6] 34 Am Jur 2d, Federal Taxation ¶ 7013.
[7, 8, 10, 13] 71 Am Jur 2d, State and Local Taxation §§ 451, 538.
[9] 71 Am Jur 2d, State and Local Taxation § 448.
[10, 11] 72 Am Jur 2d, State and Local Taxation § 753.
[12] 72 Am Jur 2d, State and Local Taxation § 831 *et seq.*

4. TAXATION—INCOME TAXES—STATUTES—ACCOUNTING PROCEDURES
—LEGISLATIVE INTENT—EXCLUSIONS FROM INCOME.

The Legislature did not intend in enacting § 271 of 1967 PA 281
to fundamentally depart from Federal accounting and tax
practices; the intention of the amendment was to allow exclu-
sions from income only where an asset disposed of was a capital
asset (MCLA 206.271; MSA 7.557[1271]).

5. STATUTES—AMENDMENTS—TIME AND PLACE—FORMAL CHANGES—
INTERPRETING ORIGINAL ACT.

The time and circumstances surrounding the enactment of a
statutory amendment may indicate that the change wrought by
the amendment was formal only; where that is the case the
matter in the amendatory act may be looked to in order to
determine what rights existed under the original act.

6. TAXATION—STATE AND FEDERAL TAXATION—PARALLEL TREATMENT
—NONPARALLEL SITUATIONS.

Parallel tax treatment under state and Federal law is not re-
quired in situations which are not parallel.

7. TAXATION—GROSS INCOME—DEDUCTIONS—DEPRECIATION OF FACILI-
TIES—PREVIOUS DEPRECIATION—FEDERAL TAXES.

A corporate Michigan taxpayer is not entitled to deduct from
gross income, as one of the costs and expenses of doing busi-
ness, depreciation for emergency facilities used in conducting
its business where the property already previously has been
fully amortized for Federal income tax purposes.

8. TAXATION—INCOME TAXES—DEPRECIATION—NET PROFIT—STATU-
TORY LIMITATIONS.

Depreciation is a cost item which may properly be deducted for
state tax purposes to arrive at net profit, but it must be
deducted within the limitations established by the applicable
statute.

9. TAXATION—INCOME TAXES—STATUTES—STATUTORY CONSTRUCTION
—TAXABLE INCOME.

The Michigan income tax statute should in general be construed
to make Michigan "taxable income" the same as "taxable
income" under the Internal Revenue Code, therefore "net
profits" are to be equal to "gross income" minus various deduc-
tions as utilized by the Federal code and the terms "expenses
and costs" must be read as being coextensive with the term
"deductions" found in the Internal Revenue Code.

10. Taxation—Income Taxes—Depreciation Basis—Fair Market
    Value—Federal Returns.

    A corporate taxpayer in 1968 was not entitled to use the fair-
    market value of its property then in use as the basis for
    depreciation of such property on its state income tax; it was
    required to use the same valuation as was used in its 1968
    Federal tax return.

11. Taxation—State and Federal Taxes—Substantive Provisions
    —Wholesale Adoption—Election of Valuation.

    The Michigan Income Tax Act does not adopt wholesale the
    substantive provisions of the Federal Internal Revenue Code;
    unlike the Federal code the state statute does not contain a
    substantive provision allowing an election of fair-market valua-
    tion for depreciation purposes of property acquired prior to the
    effective date of the state statute, rather than the actual cost
    minus depreciation value of its properties as reported in its
    1968 Federal tax returns (MCLA 206.1 *et seq.;* MSA 7.557[101]
    *et seq.).*

12. Taxation—Income Taxes—Taxable Income—State and Fed-
    eral Taxes—Equalization—Estimates of Revenue.

    The dollar amount of taxable income for state income tax pur-
    poses must be equated with the dollar amount of taxable
    income for Federal income tax purposes so that reliable esti-
    mates of revenue flowing from the state income tax act may be
    made by the Legislature.

13. Taxation—Deductions for Depreciation—Constitutional Law
    —Previous Depreciation—Federal Taxes.

    It is not unconstitutional for the state to deny a state-tax deduc-
    tion for depreciation of facilities solely on the grounds that
    such facilities had previously been depreciated for Federal tax
    purposes.

Appeals from Ingham, Ray C. Hotchkiss and
James T. Kallman, JJ. Submitted October 14,
1976, at Lansing. (Docket Nos. 26027, 27583.) De-
cided November 23, 1976. Leave to appeal applied
for.

Complaint by Michigan Consolidated Gas Com-
pany against the State of Michigan and the De-
partment of Treasury seeking a refund of taxes
paid under protest. Judgment in part for plaintiff

and in part for defendants. Plaintiff appeals and defendants cross-appeal.

Complaint by Detroit Edison Company against the State of Michigan and the Department of Treasury seeking a refund of taxes paid under protest. Both plaintiff and defendants moved for summary judgment. Motions denied. Plaintiff appeals the denial of its motion by leave granted.

The cases were consolidated on appeal. Affirmed as to both plaintiffs. Reversed as to defendants' cross-appeal.

*John M. Veale* and *David P. Van Note,* for Michigan Consolidated.

*P. D. Connor,* for Detroit Edison Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Richard R. Roesch, Maurice Barbour* and *Charles E. Liken,* Assistants Attorney General, for defendant.

Before: D. F. WALSH, P. J., and ALLEN and L. W. CORKIN,* JJ.

ALLEN, J. In this consolidated appeal, plaintiffs, public utility corporations, seek refunds of $2,928,-590[1] which they claim were wrongfully assessed and paid under protest in corporate income taxes due in 1968 and 1969 under the Michigan Income Tax Act as first enacted by 1967 PA 281 (MCLA 206.1 *et seq.;* MSA 7.557(101) *et seq.)* and prior to its amendment in 1969 and 1970.[2] Appeal is pre-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] For detail of the refunds claimed by plaintiffs *see* footnote 4, *infra.*

[2] 1969 PA 332, § 6 (MCLA 206.6; MSA 7.557(106)).

1970 PA 140, § 12 (MCLA 206.12; MSA 7.557(112)).

sented on stipulated facts which are summarized as follows.

The effective date of 1967 PA 281, the first enacted state corporate income tax, was January 1, 1968. Prior to that date Michigan Consolidated had purchased and had on hand certain gas-burning appliances and certain volumes of natural gas. After their purchase but prior to sale, both the appliances and natural gas were recorded in an inventory account. Subsequent to December 31, 1967, both the appliances and the stored gas were sold at a profit thereby increasing the company's profit. In computing its tax return for 1968, Michigan Consolidated, relying on 1967 PA 281, § 271 (MCLA 206.271; MSA 7.557[1271]), excluded from otherwise taxable income that part of the gain on the sale of the gas and appliances which was attributable to the period of time the gas and appliances were held prior to January 1, 1968.

The company also excluded from otherwise taxable income amounts representing annual depreciation of emergency facilities which had been fully depreciated for Federal tax purposes prior to 1968 under § 168 of the Internal Revenue Code but which were still in use and operation in the conduct of the utility's business.

The deductions were disallowed by the Revenue Division of the Department of Treasury which, on October 19, 1971, issued assessment F-15716 adding additional taxes for the two-year period plus interest. Michigan Consolidated paid the amount due, under protest, and filed suit in the Ingham County Circuit Court for refund. On June 6, 1975, Circuit Judge Ray C. Hotchkiss held the utility might not deduct the amount of pre-1968 gain on the sale of gas and appliances on hand. The income tax related to these two items is stipulated to

be $4,698 for appliances and $550,593 for gas, a total of $555,291. However, Judge Hotchkiss further held that the utility might deduct depreciation for the emergency facilities. The stipulated amount of taxes on this item is $20,878. Michigan Consolidated now appeals the trial court's disallowance of $555,291 and defendants have cross-appealed the trial court's allowance of $20,878.

Detroit Edison Company's initial 1968 income tax return was accepted as filed with one exception. Disallowed was depreciation of $2,898,970.06 claimed by Edison for emergency defense facilities placed in service between 1941 and 1958 but fully amortized prior to 1968 under now extinct § 168 of the Internal Revenue Code. The disallowance of the claimed depreciation allowance increased Edison's 1968 tax liability by $162,342.63 which Edison paid under protest. Whether or not Edison should be allowed to take depreciation on emergency facilities previously written off under the Federal code is precisely the same issue presented in defendants' cross-appeal from Judge Hotchkiss' decision that Michigan Consolidated might depreciate emergency facilities previously written off under the Federal code. The identity of the issues led to the consolidation of the two cases on appeal to us.

In April, 1972, Edison filed an amended 1968 tax return in which *all of its depreciable property,* including the emergency defense facilities, were calculated at the fair market value of the property January 1, 1968, rather than at the cost basis used in the initial return.[3] Under the amended return, depreciation was $105,330,492 compared with $64,-259,373 in the initial return. Allowance of the

---

[3] The depreciation reported by taxpayer in its initial return was, except for the emergency facilities item, the same as reported in taxpayer's Federal return, *viz.:* $61,360,402.94.

amended return would reduce Edison's tax liability by $2,352,421. The Revenue Division disallowed the depreciation as recomputed, and allowed only the $61,360,402.94 depreciation claimed on Edison's Federal tax return. Edison then filed a two-count complaint in the Circuit Court for Ingham County. In count one, it was alleged that the company was entitled to value its property for depreciation purposes at its fair market value January 1, 1968, and requested a refund of $2,352,-421. Count two alleged that the company was entitled to deduct depreciation for the emergency defense facilities already fully depreciated under Federal tax returns and requested a refund of the $162,342.63. Both parties then moved for summary judgment. On May 30, 1975, Circuit Judge James T. Kallman denied summary judgment to both parties, stating "neither party has presented the uncontested intent of the Legislature in regards to the act in question nor has either party conclusively shown a clear interpretation of the act". This Court granted Detroit Edison's request for leave to appeal the denial of its motion for summary judgment.

Four issues emerge from the statement of facts: (1) Did the trial court err in disallowing Michigan Consolidated a refund of $555,291 to which it would be entitled if it could exclude from income the proportion of gain on the sale of gas and appliances acquired prior to January 1, 1968 but sold thereafter? (2) Did the trial court err in holding that Michigan Consolidated was entitled to deduct $20,878 in taxes for depreciation of emergency facilities which had been fully amortized for Federal tax purposes prior to 1968 but which were still in use and operation by the company? (3) Is Detroit Edison entitled to a return of $162,342.63 in taxes for depreciation of emergency facilities

which had been fully amortized for Federal tax purposes but which were still in use and operation by the company? (4) Is Detroit Edison entitled to use for depreciation purposes the fair market value of its property in use January 1, 1968, rather than the cost basis as reported in its Federal tax return—it being stipulated that if the answer to this question is "yes", Detroit Edison is entitled to a refund of $2,352,421.[4] As noted earlier, issues 2 and 3 are identical. Thus, for purposes of our appellate review, three issues, *viz.* numbers 1, 2 & 4, remain. In somewhat reworded form, the remaining issues are hereinafter discussed.

I. *Does § 271 of the Michigan Income Tax Act of 1967 authorize a taxpayer to exclude from taxable income or deduct from gross income profits from the sale of natural gas and gas appliances acquired before the effective date of the act, but sold thereafter?*[5]

Section 271 of the Michigan Income Tax Act as originally enacted and in effect when Michigan Consolidated computed its income tax for 1968 reads as follows:

"Sec. 271. (1) A taxpayer subject to the tax levied by section 61 or 71 and whose income received after December 31, 1967 is increased or diminished by the *disposition of an asset* acquired before January 1, 1968

---

[4] If plaintiffs were to prevail in full on issues 1, 2 and 4, the amount of refund due plaintiff would be $2,928,590. If plaintiffs were to fail on issue 4 but prevail on issues 1, 2 and 3, the refund would be $738,511. Thus, the maximum exposure of defendants is $2,928,590.

[5] In its brief, Michigan Consolidated words the above issue as follows: "Was the unqualified term 'asset' as set forth in Section 271 of PA 281, the Michigan Income Tax Act, in 1968 limited to 'capital assets'?".

may elect to recompute taxable income by excluding therefrom the proportional *gain* or *loss* incurred prior to January 1, 1968. Taxpayers so electing shall be subject to a tax on taxable income thus recomputed at the rates imposed by this act. An election so made shall include all items of gains or losses realized during the taxable year." (Emphasis supplied.) MCLA 206.271; MSA 7.557(1271).

Section 271 was amended in 1969 by 1969 PA 332 to read:

"Sec. 271. (1) A taxpayer subject to the tax levied by section 61 or 71 and whose income received after December 31, 1967 is increased or diminished by the disposition of *property* acquired before January 1, 1968, *which is described in and subject to the provisions of subchapter P of the internal revenue code,* may elect to recompute taxable income by excluding therefrom the proportional gain or loss incurred prior to January 1, 1968." (Emphasis supplied.)

Subchapter P of the Internal Revenue Code deals with the treatment of capital gains and losses for Federal income tax purposes. 26 USCA 1201 *et seq.* Michigan Consolidated argues that its natural gas and gas-burning appliances were "assets" as that term was used in 1968; that the term "asset" was not limited to any particular type of asset and to construe it to be limited to "capital assets", as did the lower court, is judicial legislation; that the case of *Cook v Department of Treasury,* 396 Mich 176; 240 NW2d 247 (1976), construed § 271 as it was first enacted and is authority for holding the § 271 exclusion is available to Michigan Consolidated. Finally, taxpayer argues that the 1969 amendment of § 271, *supra,* by which the Legislature clearly indicated that the word "asset" was tied to capital gains and losses, was a substantive

change evidencing an intent to change the law and was not, as defendants claim, a clarifying amendment interpretive of the original intent of the Legislature. For the reasons set forth below, we respectfully disagree.

It is generally recognized that the Michigan income tax, both personal and corporate, is basically a "piggy-back" on the Federal income tax. See *Production Credit Association v Treasury Department,* 68 Mich App 409, 414; 242 NW2d 794 (1976). Numerous sections of the statute as first enacted make this clear.[6] Obviously, the Legislature intended to impose the state income tax "piggy-back" on Federal taxable income unless otherwise provided by statute. It is undisputed that the sale of stored gas and gas appliances was from inventory. It is also undisputed that for Federal tax purposes, gain from the sale of inventory is not subject to a special deduction.[7] It does not produce "capital gain" entitling the taxpayer to a deduction from gross income. Likewise, it is undisputed that the taxpayer, in preparing its Federal tax return for 1968, computed the gain received from the sale of gas and gas appliances as

---

[6] "2(3) It is the intention of this act that the income subject to tax be the same as taxable income as defined and applicable to the subject taxpayer in the internal revenue code, except as otherwise provided in this act." This subsection has never been amended.

\* \* \*

"12(3) 'Net profits' means the net gain from the operation of a business, profession or enterprise, after provision for all costs and expenses incurred in the conduct thereof, determined on either a cash or accrual method, *on the same basis as provided for in the internal revenue code for federal income tax purposes * * * ."* (Emphasis supplied.)

[7] Under the Internal Revenue Code a "capital asset" is defined as "property held by the taxpayer * * * but does not include (1) stock in trade of a taxpayer or other property of a kind which properly would be included in the inventory of the taxpayer * * * or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 USCA 1221.

ordinary income. Obviously, the construction given § 271 by Michigan Consolidated would amount to a drastic and fundamental change in the corporate tax law. It would mean that every business deriving gain from the sale of inventory could have a deduction for Michigan taxes which would not be allowed under Federal law. We do not believe § 271 signals so drastic a change. Had the Legislature intended to so fundamentally depart from Federal accounting and tax practices it would, in our opinion, have done so in precise language. Given the broad intent of the Legislature to piggyback and the fact that 1967 PA 281 was the first enacted state income tax law, we believe that a more rational and consistent interpretation of § 271 to be that, in admittedly awkward language, the Legislature intended to allow exclusions only where the asset disposed of was a capital asset. Key phrases such as "disposition of an asset", "gain or loss incurred" and "gains or losses realized" are all words used in the Federal code to describe capital (as distinguished from ordinary) gains and losses.[8] This interpretation of § 271 as being a reference to capital gains couched in awkward language gains credence from the action taken by the Legislature just one year later when 1969 PA 332 was passed. As noted earlier, the amendment of § 271 substituted for the word "asset" language clearly limiting the section to capital assets. By this action the Legislature stripped away the overbroad connotations flowing from the word "asset" and substituted the more precise language descriptive of the original legislative intent.

---

[8] For example, Subchapter O, part 1 of the IRC dealing with capital assets uses the words "gain from the sale *or other disposition* of property".

" * * * [The] time and circumstances surrounding the enactment of the amendment may indicate that the change wrought by the amendment was formal only—that the legislature intended merely to interpret the original act. If such is the case, the matter in the amendatory act may be looked to in order to determine what rights existed under the original act." 1A Sutherland, *Statutory Construction* (4th Ed), § 22.30, p 179.

"While in many and perhaps most instances it undoubtedly is the legislative intent, in enacting an amendment, to change existing law, there are, as undoubtedly, other instances, particularly if uncertainty exists as to the meaning of a statute, when amendments are adopted for the purpose of making plain what the legislative intent had been all along from the time of the statute's original enactment." *Detroit Edison Co v Janosz,* 350 Mich 606, 614; 87 NW2d 126 (1957).

*Cook v Department of Treasury, supra,* is not inconsistent with our conclusions. In that case the plaintiff received $173,032.55 in a lump sum in 1968 from a profit-sharing trust. Relying on § 271 as then in effect he claimed $158,680,000 was exempt since it was acquired prior to October 1, 1967.[9] The Court of Appeals held that the § 271 exclusion did not apply to plaintiff because, in the Court's opinion, plaintiff's interest in the trust (asset) had not vested but was contingent until received in 1968. The Supreme Court reversed, holding that the trust interest was not contingent but was 100% vested prior to the effective date of the personal income tax.[10] At no point in the published opinion did the Court reach the issue

---

[9] The first personal income tax became effective October 1, 1967, but the first corporate income tax was made effective January 1, 1968.

[10] "Since plaintiff's 100% vested interest was an asset acquired, the exchange of that interest for cash he received satisfies the 'disposition' requirement of the statute, contrary to the Court of Appeals holding". *Cook v Department of Treasury,* 396 Mich 176, 183; 240 NW2d 247 (1976).

involved in the case before us, *viz.:* does § 271 as first enacted apply only to capital assets or does it apply to any property interest. Throughout the proceedings the trust proceeds were treated as a "capital asset".[11]

In *Cook,* the Supreme Court recognized that, under its decision, "plaintiff's tax treatment will vary from his Federal tax treatment". That result was possible, the Court said, because parallel tax treatment was not required "in situations which are not parallel". 396 Mich at 183. In this case, we find that the Legislature intended that adjustments under § 271, in fact, parallel Federal income tax provisions regarding capital gains and losses, particularly with respect to § 271's applicability to *capital* assets and not to assets such as inventory.

II. *Is a corporate taxpayer entitled to deduct from gross income, as one of the costs and expenses of doing business, depreciation for emergency facilities used in conducting its business even though the property has been fully amortized for Federal income tax purposes?*

Though the parties have framed this issue differently[12] the thrust of the argument of both taxpay-

---

[11] We have examined the briefs and record filed with the Supreme Court and find that the parties themselves agreed that if the trust proceeds were an asset the asset was a capital asset to which capital gains treatment would be accorded. The only difference between the parties was whether the trust proceeds were an asset at all. Plaintiff claimed it was a capital asset since § 402(a)(2) of the IRC provided that such type of distribution "shall be considered a gain from the sale or exchange of a capital asset". Defendant contended that "what appellant had was merely an interest in deferred compensation which ripened into fruition" later in 1968. The Court held in plaintiff's favor.

[12] Michigan Consolidated frames the issue: "May defendant disallow a deduction of annual charges for depreciation of property used in conducting plaintiff's business from plaintiff's 'costs and expenses' in determining taxable income under the Michigan Income Tax Act

ers is that the 1968 act imposed a tax on corporate "net profits"; that net profits are computed after deducting costs and expenses incurred in the operation of a business; that depreciation has long been recognized as a cost of doing business; that the emergency facilities, though fully depreciated for Federal purposes, were still in use and a cost item; ergo, the taxpayer should be allowed to deduct the expense. We disagree for two reasons. First, though we concede that depreciation is a cost item which may properly be deducted to arrive at "net profit" it must nevertheless be deducted within the limitations established by the 1968 statute. Section 12(3) as then worded provided:

" 'Net profits' means the net gain from the operation of a business, profession or enterprise, *after provision for all costs and expenses incurred in the conduct thereof,* determined on either a cash or accrual method, *on the same basis as provided for in the internal revenue code* for federal income tax purposes, but without deduction of any taxes imposed on or measured by income including taxes imposed by this act and without deduction of net operating loss carry-over or capital loss carry-over sustained prior to January 1, 1968." (Emphasis supplied.) MCLA 206.12(3); MSA 7.557(112)(3).

Clearly, § 12(3) indicates that there may *only* be deductions for costs and expenses as provided for Federal purposes.

Second, we believe *Production Credit Association v Treasury Department,* 68 Mich App 409; 242

because such property has been fully amortized as 'emergency facilities' for Federal Income Tax purposes?". In the Edison case, the trial court certified the issue in four questions, one of which was worded "Did the Michigan Income Tax Act, as in effect in 1968, require that the taxable income reported * * * for Michigan income tax purposes be identical to the taxable income reported by such taxpayer for Federal income tax purposes for 1968?".

NW2d 794 (1976), is controlling. There, plaintiff taxpayers attempted to deduct from their amended 1968 returns losses incurred in 1969. For Federal purposes the 1969 losses were not deducted from the taxpayers' 1968 Federal return since the deductions had been taken for Federal purposes in amended 1966 and 1967 returns. On appeal to this Court, taxpayers argued, as they do here, that the two tax systems are not piggy-backed since the Federal system taxes gross income whereas the Michigan tax is on net gain. Our Court disagreed, saying:

"Although § 2(2) gives us little guidance, we find § 2(3) to be dispositive of this issue. That latter section indicates that the Michigan act should in general be construed so as to make Michigan 'taxable income' the same as the 'taxable income' under the Internal Revenue Code. Viewing § 12(3) in that light, we must conclude that 'net profits' were intended to be equal to 'gross income' minus various 'deductions' as utilized by the Federal code. The term 'expenses and costs' must therefore be read as being coextensive with the term 'deductions' found in the Internal Revenue Code." 68 Mich App at 413–414.

Plaintiffs seek to minimize the precedential value of *Production Credit* by pointing out that it concerns a loss carry-back whereas the instant case deals with depreciation. We grant the distinction but find it to be inconsequential. Whether the item of dispute was loss carry-back or depreciation, each was treated by the Court as an item of cost which might properly be taken but only as permitted under the Internal Revenue Code. Further, *Production Credit* is directly on point on a second issue. There, as here, plaintiffs argued that despite

the fact that the deductions had been "used up" for Federal purposes, they still might be used for Michigan purposes. Again the Court disagreed:

"Plaintiffs' argument is certainly not lacking in logical appeal, but we are not to decide this issue in a vacuum. In § 2(3) of the Michigan act, the Legislature expressly set up a frame of reference for deciding issues of legislative intent. Specifically, that section states that 'the *income* subject to tax [is intended to] be the same as taxable *income* as defined * * * in the internal revenue code'. (Emphasis added.) We view that section as evidence of an intent to equate the dollar amount of the taxable income for state income tax purposes with the dollar amount of the taxable income for Federal income tax purposes. In addition, we think that it is in keeping with § 2(2) to view the term 'taxable income' as a reference to those years in which a *Federal* income tax is in existence. Therefore, we hold that the plaintiffs were properly required to carry back their 'net operating loss' for 1969 to the same years as in their Federal income tax returns." 68 Mich App at 417.

We further find that *Production Credit* is also supportive of our decision in Issue I, *supra.* In the course of its opinion the Court had occasion to refer to the amendment made in § 12(3) by 1969 PA 332. Just as we have concluded in the instant appeal that this statute was an act clarifying the original intent of the Legislature inartistically expressed in § 271, so, too, the Court found that the statute was a clarification rather than a substantive change in § 12(3).

III. *For the year 1968, was a corporate taxpayer entitled to use the fair market value of its property then in use, including emergency facilities, as the basis of depreciation of such property, or must taxpayer use the same valuation as was used by the taxpayer in its 1968 Federal tax return?*

By far the greatest dollar rebate to which plain-

tiffs would be entitled, were plaintiffs to prevail, stems from Detroit Edison's use of 1968 market value for depreciation purposes rather than use of actual cost of its properties as reported in its 1968 Federal tax return.[13] Edison argues that §§ 1012, 1016 and 1053 of the Internal Revenue Code mandate that for property acquired after March 1, 1913 (the effective date of the Federal act), the taxpayer must use the cost of the property when acquired less depreciation deductions previously allowed or allowable, but, for property acquired prior to the effective date of the Federal statute, the taxpayer may in its option use the 1913 fair market value. *Doyle v Mitchell Bros Co,* 247 US 179; 38 S Ct 467; 62 L Ed 1054 (1918), *Clinton Cotton Mills v Commissioner of Internal Revenue,* 78 F2d 292 (CA 4, 1935). We have no quarrel with Edison's statement of the law on this point. Jumping off from this postulate Edison argues that if indeed the Internal Revenue Code is "a reference point" for state income tax purposes or is truly a piggy-back on the Federal code, then the taxpayer is entitled to the benefit of any appreciation in value of its property occurring prior to the effective date of the state statute. We quarrel with Edison's conclusion. Unlike the Internal Revenue Code, 1967 PA 281 does not contain a substantive provision allowing an election as to valuation. The Michigan act, though piggy-back, does not adopt wholesale the substantive provisions of the Internal Revenue Code. Instead, the Federal code "is to be used as an interpretive code". *Production Credit v Treasury Department, supra,* 413. To allow Edison to employ a different valuation method on its Michigan return obviously would lead to a differ-

---

[13] $2,532,421 of requested refunds of $2,928,590. *See* footnote 4.

ent dollar amount of taxable income than the dollar amount of Federal income. This is expressly prohibited by the decision in *Production Credit, supra.*

"We view that section [§ 2(3)] as evidence of an intent to equate the *dollar amount* of the taxable income for state income tax purposes with the dollar amount of the taxable income for Federal income tax purposes." (Emphasis supplied.) 68 Mich App at 417.

In interpreting the legislative intent of a statute it is appropriate to consider the legislative intent as expressed in its title. The title to 1967 PA 281 recites, *inter alia,* that it is "an act to meet deficiencies in state funds". If the statute is designed to meet deficiencies in state funds it is common knowledge of which we take judicial notice that estimates of revenue flowing from the new act must be made. Const 1963, art 4, § 31. Realistically, the executive branch of the government and the Legislature have no solid basis upon which to project forthcoming revenues other than to measure the yield from Federal tax returns. This, in itself, explains why the Legislature patterned the statutory provisions on the Internal Revenue Code. Such estimates of revenue yield become naught if the taxpayer, particularly large corporate taxpayers, may jump around using one set of valuations for depreciation purposes on Federal returns and an entirely different set of valuations for state purposes. The same argument applies to signal a legislative intention to preclude the taxpayer from depreciating facilities fully amortized prior to 1968 by the taxpayer (Issue II, *supra)* or excluding profits from the sale of inventory acquired prior to the effective date of the act which are not excludable for Federal tax purposes (Issue I, *supra).*

IV. *Does the denial of any deduction for deprecia-
tion of facilities solely on the grounds that
such facilities had previously been depreciated
for Federal purposes make 1967 PA 281 un-
constitutional?*

Finally, Edison argues that if the statute is
interpreted as not allowing depreciation of facili-
ties previously fully written off for Federal tax
purposes the statute is constitutionally suspect in
three respects. While this allegation was appar-
ently not presented to the trial court and certainly
was not decided by the trial court, we deem it
appropriate to respond.[14]

First, it is argued that because the statute is
vague and has required considerable interpreta-
tion and legislative clarification it is not "distinct"
and therefore is violative of Const 1963, art 4, § 32
which reads, "[E]very law which imposes, contin-
ues or revises a tax shall distinctly state the tax".[15]
In reality the defect alleged is a matter of statu-
tory construction rather than a constitutional
guarantee. Obviously, if tax statutes were to be
found unconstitutional merely because they re-
quired judicial interpretation or were unconstitu-
tional merely because judicial interpretations were
not favorable to the taxpayer, the length of law
bookshelves would be considerably reduced.

Second, it is said that according to its title the
act imposes "taxes on or measured by net income";

[14] Appellate courts are reluctant to face constitutional issues in
advance of their determination by the trial court. *See* 16 Am Jur 2d,
Constitutional Law, §§ 109, 111, 5 Am Jur 2d, Appeal and Error,
§ 873.

[15] "Accordingly, we believe that the court should be guided by Art.
4, Sec. 32 of the Michigan Constitution and the substantial body of
case law holding that in situations where the taxing statute is at all
ambiguous it must be strictly construed in favor of the taxpayer."
(Detroit Edison brief.)

that by refusing to recognize depreciation on emergency facilities in use the act is in part converted from a tax on net income to a tax on gross income which would be outside the object of the act as expressed in its title. We reject that argument because our rulings on Issues I-III have defined "net income" in a manner which destroys the definitional assumption behind the plaintiff's argument.

Finally, it is asserted that denial of depreciation would improperly and unreasonably designate taxpayers who had elected to use the faster write-off allowed by § 168 of the Internal Revenue Code as a separate class for tax purposes—this being contrary to the Equal Protection clauses of the state and Federal constitutions. The identical argument was made and rejected in *Production Credit v Treasury Department, supra.*[16]

Case #26027 affirmed as to Michigan Consolidated Gas Company as plaintiff-appellant, and reversed as to State of Michigan and Department of Treasury as cross-appellants. Case #27583 affirmed. No costs, a public question being involved.

---

[16] "We further hold that the calculation method discussed above does not violate the principles of equal protection." *Production Credit Association v Treasury Department,* 68 Mich App 409, 417; 242 NW2d 794 (1976).